UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DOUGLAS WHEELER**,　　　　　　　　　　　　Case No. 5:12 CV 445

　　　　Plaintiff,　　　　　　　　　　　　　　Judge Donald C. Nugent

　　v.　　　　　　　　　　　　　　　　　　　REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL
SECURITY**,

　　　　Defendant.　　　　　　　　　　　　Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Douglas Wheeler seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated February 23, 2012). For the reasons given below, the Court should affirm the Commissioner's decision denying benefits.

## BACKGROUND

Procedural History

In April 2008, Plaintiff filed an application for DIB alleging disability since November 12, 2007 due to peripheral neuropathy, depression, anxiety, and chronic fatigue. (Tr. 111–12, 130). His claims were denied initially and upon reconsideration. (Tr. 82–90, 92–98). Plaintiff requested an administrative hearing to review this decision (Tr. 99), which was held September 1, 2010. (Tr. 47).On September 21, 2010, the ALJ issued a decision denying Plaintiff's claim. (Tr. 22–33).

Vocational Background

Plaintiff was 48 years old on his alleged disability onset date and 51 years old at the time of

the ALJ's decision. (Tr. 22, 33, 50). After high school, Plaintiff spent 12 years performing skilled labor in the steel industry. (Tr. 65). At age 29, Plaintiff went to college and received a two-year degree while working in the steel mill full time. (Tr.65–66). Upon graduation, Plaintiff took a job in public accounting and later as a financial controller. (Tr. 66).

Medical History

Plaintiff saw treating physician I. Praveen Kumar, M.D. on October 17, 2007 because he was experiencing numbness and tingling in his lower extremities, previously diagnosed as peripheral neuropathy. (Tr. 236). Dr. Kumar noted Plaintiff's neuropathy symptoms were worse. (Tr. 236). At that time, Dr. Kumar described Plaintiff as having a history of diabetes, sleep apnea, and obesity. (Tr. 236).

On November 15, 2007 Plaintiff saw neurologist Jay P. Berke, M.D. regarding the numbness, burning, and tingling he was experiencing. (Tr. 221). Dr. Berke noted areflexia and diminished vibratory sensation in Plaintiff's feet and also noted Plaintiff had a history of diabetes and alcoholism. (Tr. 221). He diagnosed peripheral neuropathy, which likely resulted from Plaintiff's diabetes and alcohol use. (221). At this time, Dr. Berke prescribed Lyrica to treat Plaintiff's neuropathy. (Tr. 221).

Dr. Kumar completed a long-term-disability statement for Plaintiff on January 25, 2008. (Tr. 229–30). He reported Plaintiff had painful peripheral neuropathy, with symptoms consisting of chronic, severe pain in his feet, legs, and arms. (Tr. 229–30). Dr. Kumar indicated Plaintiff could not sit, stand, or walk for prolonged periods of time and opined Plaintiff's severe pain restricted his ability to bend, lift, squat, or crawl. (Tr. 230). Dr. Kumar stated Plaintiff could not work at the time and did not know when Plaintiff could return to work. (Tr. 230).

On February 18, 2008 Plaintiff returned to Dr. Kumar for a follow-up visit. (Tr. 244). Plaintiff told Dr. Kumar he had tried taking Neurontin but it had not helped and also reported he had stopped taking Lyrica because although it improved his symptoms a little, Plaintiff was experiencing strange dreams, drowsiness, and weight gain. (Tr. 244). Plaintiff stated the Cymbalta he had been prescribed had helped to some extent. (Tr. 244). Plaintiff told Dr. Kumar he was depressed because of the continuous pain. (Tr. 244). Plaintiff's depression and continuous pain were causing him to have difficulty sleeping and concentrating. (Tr. 244). Dr. Kumar found Plaintiff was still unable to work due to persistent pain and difficulty concentrating, further stating Plaintiff should stay off work until further notice. (Tr. 244).

On March 13, 2008 Plaintiff saw Michael D. London, M.D. complaining of bilateral shoulder pain. (Tr. 264–65). Plaintiff had previously treated with Dr. London for knee problems and surgeries in 2003 and 2006. (*See* Tr. 267–85). At the March 13, 2008 visit, Plaintiff reported increased pain with overhead activities, driving, and sleeping on his right arm. (Tr. 264). On examination, Plaintiff demonstrated no instability in his upper extremities and had normal motor strength and muscle tone. (Tr. 264). Dr. London noted Plaintiff had mild spurring over the AC joint bilaterally, but no tenderness to palpitation over those joints. (Tr. 265). Plaintiff did exhibit tenderness to palpation "over the long head of the biceps tendon and the subacromial space bilaterally." (Tr. 265). He had a positive impingement sign bilaterally and a negative drop arm sign bilaterally. (Tr. 265). Overall, Plaintiff had full active non-irritable range of motion in both shoulders, his neurovascular status was intact, and radiographs of both shoulders were unremarkable. (Tr. 265). Dr. London stated Plaintiff's symptoms were most consistent with bilateral rotator cuff tendonitis, with the right shoulder more symptomatic than the left. (Tr. 265). He prescribed Naprosyn, a prescription pain reliever, and

3

physical therapy. (Tr. 265).

In April 2008, Plaintiff returned to Dr. London reporting his shoulder pain had not improved. (Tr. 263). Plaintiff stated physical therapy had been worsening his symptoms. (Tr. 263). Dr. London ordered an MRI, which verified Plaintiff had moderate tendinitis in his shoulder that did not require surgery. (Tr. 261). Dr. London gave Plaintiff injections of DepoMedrol and Marcaine, which provided some symptom relief. (Tr. 261). During April 2008, Dr. London's treatment notes show Plaintiff was experiencing pain which limited his daily activities. (Tr.261–63). Plaintiff returned for a follow up on June 23, 2008, reporting "moderately good symptom relief" for about a week after the injection. (Tr. 260). Plaintiff admitted his symptoms decrease when he took Naprosyn, but stated he did not take the drug on a regular basis. (Tr. 260). Dr. London instructed him to continue taking the pain medication and planned to follow up in two months to further evaluate Plaintiff's condition. (Tr. 260).

Plaintiff saw Dr. Kumar and Dr. Berke several times between March and July 2008. (*See* Tr. 332–35, 337–40). During each visit there was generally little change in Plaintiff's condition; Plaintiff continued to report pain unimproved by medication, and Dr. Kumar stated Plaintiff was unable to work. (Tr. 332, 337–40). However on June 19, 2008, Dr. Berke stated Plaintiff's condition had improved since November 2007. (Tr. 335). On July 11, 2008 Dr. Kumar completed a telediction response to the Bureau of Disability Determination stating Plaintiff had a prior history of alcohol abuse, sleep apnea, diabetes mellitus, hypertension, symptomatic small fiber neuropathy, depression, insomnia, and chronic fatigue. (Tr. 327). Dr. Kumar believed Plaintiff "should be qualified for disability because of his underlying medical conditions." (Tr. 324.)

On August 20, 2008 Plaintiff saw Dr. Burkholder for his unresolved symptoms because Dr.

4

Berke was absent. (Tr. 421–22). Dr. Burkholder noted a previous EMG failed to show definite evidence of peripheral neuropathy. (Tr. 421). He also noted a number of medications that had not improved Plaintiff's symptoms or had caused unwanted side effects. (Tr. 421). Sensory examination showed reduced vibratory sense in Plaintiff's toes, reduced pin perception in his knees, and somewhat reduced tactile sensation above the ankle. (Tr. 421–22). Plaintiff's gait was normal, including tandem walking, and Romberg's sign was not present. (Tr. 422). Dr. Burkholder ordered a percutaneous skin biopsy for nerve fiber density to determine if pathologic evidence of peripheral neuropathy existed. (Tr. 422). He stated if pathological evidence of peripheral neuropathy was present, Plaintiff should be treated with more pain medication and if the pathology for peripheral neuropathy was not present, Plaintiff should be evaluated for an underlying emotional cause of his condition. (Tr. 422). This biopsy was collected on November 10, 2008. (Tr. 423–25). Plaintiff's left calf had significantly reduced epidermal nerve fiber density, a result consistent with small fiber neuropathy. (Tr. 423). Plaintiff's left thigh showed normal nerve fiber density. (Tr. 423).

In December 2008, Plaintiff sought treatment at the Cleveland Clinic Neurological Institute upon referral from Dr. Kumar. (*See* Tr. 472–82). Plaintiff was found to have "[s]tocking and glove decreased perception of light touch, pinprick, and vibration, and proprioception". (Tr. 474). His neurological examination was otherwise normal and plaintiff appeared well. (Tr. 472–74). Test results showed "no evidence of significant postganglionic sympathetic sudomotor abnormality like that seen in autonomic/small fiber neuropathy." (Tr. 480).

Plaintiff returned to the Cleveland Clinic in March 2009 for further evaluation of his neuropathic pain. (Tr. 467). Plaintiff's extremities were normal except for loss of light touch sensation in both hands and feet bilaterally. (Tr. 469). His upper and lower extremity strength was

5

intact, and he had a normal spine range of motion. (Tr. 469). At this time, Plaintiff was started on Topamax and the doctor recommended use of a TENS unit. (Tr. 469). Plaintiff was not prescribed narcotics because of his history of addiction. (Tr. 469).

Subsequent appointments revealed no improvement from the TENS unit but some help from the Topamax, although this also caused plaintiff to have difficulty concentrating and caused headaches. (Tr. 458, 464–65). At these appointments, Plaintiff's extremities were normal, his range of motion was normal, his muscular strength was intact, and his gait was normal, though he had decreased sensation. (Tr. 458, 465). On July 29, 2009, Plaintiff underwent a pain medicine evaluation with Gwenn Holler, CNS at the Cleveland Clinic. (Tr. 453–56). She noted his pain suggested very severe functional impairment. (Tr. 454). His neurological exam was positive for numbness and weakness. (Tr. 454). Holler recommended a chronic pain rehabilitation program and listed Plaintiff's prognosis as good. (Tr. 456).

In subsequent visits to Dr. Kumar dating from June 2009 to June 2010, Plaintiff's condition remained unchanged. (*See* Tr. 499–505).

Opinion Evidence

Treating physician Dr. Kumar assessed Plaintiff's physical residual functional capacity (RFC) on October 6, 2008. (Tr. 408–11). He stated Plaintiff's pain constantly interferes with his attention and concentration to perform even simple tasks. (Tr. 409). He also opined Plaintiff is incapable of even low stress jobs due to anxiety, depression, and neuropathy. (Tr. 409). Dr. Kumar stated Plaintiff could maybe walk for a block without rest or severe pain. (Tr. 409). He believed Plaintiff could sit for only five minutes at a time, for a total of one hour per day. (Tr. 409). He stated Plaintiff could sit, stand, and walk for less than two hours per day, but also stated Plaintiff needs to

walk around during a work day. (Tr. 409–10). Dr. Kumar also opined Plaintiff would need to shift positions at will and would take unscheduled breaks every few minutes due to pain. (Tr. 410). Additionally, Dr. Kumar stated Plaintiff could never lift any weight; could never twist, stoop, or crouch; could never climb ladders or stairs; had significant limitations in repetitive reaching, handling, and fingering; and wold likely miss work more than four times each month. (Tr. 410–11).

On August 5, 2008, Plaintiff was evaluated by consultative psychologist James M. Lyall, Ph.D. (Tr. 359–62). Plaintiff drove himself to Dr. Lyall's office and arrived on time for the interview. (Tr. 359). Dr. Lyall gave Plaintiff a global assessment functioning score of 55. (Tr. 361). This score is composed of a symptom impairment score of 55 due to Plaintiff's depressive features and a functional impairment score of 65 taking into account Plaintiff's focus and attention problems. (Tr. 361). Dr. Lyall found Plaintiff had moderate impairment in his ability to relate to others; his ability to maintain attention and perform simple repetitive tasks; and his ability to handle work related stress and pressure. (Tr. 362.) Dr. Lyall also found Plaintiff had mild impairment in his ability to understand and follow instructions. (Tr. 362).

State non-examining consultant R. Kevin Goeke, Ph.D. completed Psychiatric Review Technique and Mental RFC forms on August 12, 2008. (Tr. 380–97). Dr. Goeke found Plaintiff's psychological complaints credible in nature but not severity. (Tr. 396). He determined Plaintiff retained the ability to perform simple to moderately detailed tasks in a low social demand setting without strict time or production standards. (Tr. 396). Dr. Goeke's assessment was affirmed four months later by non-examining consultant Aracelis Rivera, Psy.D. (Tr. 434).

Consulting physician Myung Cho, M.D. assessed Plaintiff's RFC on September 8, 2008. (Tr. 398–405). Dr. Cho found Plaintiff can occasionally lift and carry up to 50 pounds and frequently

lift and carry up to 25 pounds. (Tr. 399). Dr. Cho found Plaintiff can stand, walk, or sit for up to six hours in a normal workday. (Tr. 399). Dr. Cho also found Plaintiff limited in his ability to push or pull with his lower extremities. (Tr. 399). Additionally, Dr. Cho opined Plaintiff can never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to temperature extremes; and should avoid all exposure to unprotected heights. (Tr. 400, 402). Ultimately, Dr. Cho found Plaintiff's statements regarding his symptoms were credible in nature and severity. (Tr. 403).

State consultative examiner Murrell Henderson, D.O. evaluated Plaintiff on December 5, 2008. (Tr. 426–32). Dr. Henderson found Plaintiff's symptoms consistent with peripheral neuropathy, but Plaintiff demonstrated a satisfactory range of motion in his upper and lower extremities; satisfactory grip strength; and no abnormalities were noted on his sensory exam. (Tr. 427). Dr. Henderson did not note any limitations associated with Plaintiff's condition. (Tr. 427).

Consultative physician Rebecca Neiger, M.D. completed a Physical RFC Assessment on January 23, 2009. (Tr. 435–42). Dr. Neiger found Plaintiff can occasionally lift and carry 20 pounds and frequently lift or carry 10 pounds. (Tr. 436). She also found Plaintiff can stand, walk, or sit for up to six hours in a normal workday. (Tr. 436). Dr. Neiger found Plaintiff is limited in his ability to push or pull with his lower extremities. (Tr. 436). Supporting this opinion, Dr. Neiger stated Plaintiff was unable to squat completely due to knee pain, though he could walk without difficulty and had a normal sensory exam. (Tr. 436–37). She opined Plaintiff is limited to only occasional foot controls bilaterally. (Tr. 437). Dr. Neiger found Plaintiff could never climb ladders, ropes, or scaffolds. (Tr. 437). She stated he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 437). Overall, Dr. Neiger found Plaintiff's statements regarding his limitations only partially credible, stating objective medical findings and physical examination did

not support his alleged degree of limitations. (Tr. 440). Specifically, an EMG showed very mild mononeuropathy; Plaintiff had 5/5 strength throughout; he could use his hands normally; and he could walk normally without the use of an ambulatory aid. (Tr. 440). Dr. Neiger recommended discounting Dr. Kumar's statement that Plaintiff "should qualify for disability based on his underlying medical conditions" because he did not provide objective findings and testing to support his opinion. (Tr. 441).

Administrative Hearing and ALJ Decision

At the ALJ hearing, Plaintiff testified his chronic pain limited his functioning beyond what state experts believed. (Tr. 50–69). Plaintiff testified he could walk for ten minutes, sit for an hour, and frequently lift up to ten pounds but no more than that even occasionally. (Tr. 56). Plaintiff further testified he could climb the stairs in his two story home one to two times per day. (Tr. 53). He testified he could only drive about once a week and never for more than fifteen minutes. (Tr. 53). Additionally, Plaintiff testified that although he attended church regularly, he was no longer able to attend the weekly Bible study class. (Tr. 53).

A vocational expert (VE) testified as to Plaintiff's job prospects in his current condition. (Tr. 69–75). The ALJ asked the VE to consider a person of Plaintiff's age, educational background, and vocational history who could perform medium work, with the following limitations:

> [T]hat individual could push or pull frequently below the shoulder level, but only occasionally above the shoulder level. Further that individual could only occasionally operate foot controls and occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl, but this individual could never climb ladders, ropes or scaffolds. Further, this individual can only occasionally perform overhead reaching bilaterally . . . but they could occasionally finger and feel objects. . . . Further, this individual would have to avoid concentrated exposure to hazardous moving machinery and unprotected heights. Also, this individual could only perform simple, routine and repetitive tasks in a low stress environment . . . mean[ing] no fixed production quotas. And finally, this individual could only occasionally interact with

9

the public, coworkers and supervisors.

(Tr. 71). The VE testified such a person could perform the jobs of cleaner at a hospital, bus boy, and cook helper, each accounting for significant jobs in the national economy. (Tr. 72).

Limiting the individual to light work with the same limitations, the VE testified such a person could perform occupations such as office cleaner, outside deliverer, and cafeteria attendant, each of which accounts for significant jobs in the national economy. (Tr. 72–73). When the ALJ limited the hypothetical person to sedentary work, the VE testified no jobs would be available due to the limitation on fingering and feeling. (Tr. 73–74). Responding to Plaintiff's counsel, the VE also testified there would be no jobs for a person who could sit for only two hours at a time, would need to shift positions at will, would take frequent unscheduled breaks due to pain, would have their attention and concentration impaired more than 34 percent of the time, and was likely to be absent more than four days each month. (Tr. 74–75).

On September 21, 2010, the ALJ issued his decision finding Plaintiff not disabled. (Tr. 19–33). After considering the entire record, the ALJ determined Plaintiff can perform light work, with the following limitations:

> [He] is capable of frequent reaching, pushing, and/or pulling bilaterally below shoulder level; occasional reaching, pushing, and/or pulling bilaterally overhead; occasional operation of foot controls; occasional postural movements but no climbing of ladders, ropes, or scaffolds; frequent bilateral handling; occasional bilateral fingering and feeling; and he must avoid concentrated exposure to extreme cold, vibration, hazardous moving machinery, and unprotected heights. In addition, [he] is capable of simple, routine, and repetitive tasks that are low-stress, meaning no fixed production quotas, and occasional interaction with the public, co-workers, and supervisors.

(Tr. 26). The ALJ then found – based on the VE's testimony – that Plaintiff could successfully adjust to other work existing in significant numbers in the national economy. (Tr. 33). The Appeals

Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3–7).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C.§ 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c (a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is

11

disabled:

> 1. Was the claimant engaged in a substantial gainful activity?
>
> 2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
>
> 3. Does the severe impairment meet one of the listed impairments?
>
> 4. What is claimant's residual functional capacity and can claimant perform past relevant work?
>
> 5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520 (b)–(f) & 416.920 (b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff asserts two errors in the ALJ's decision:

> 1. The ALJ erred in his decision to give minimal weight to the opinion of Plaintiff's treating physician, Dr. Kumar.
>
> 2. The ALJ erred in finding that Plaintiff's statements about the persistence and limiting effects of his impairments are not credible to the extent that they are inconsistent with the residual functional capacity finding.

(*See* Doc. 11, at 1).

Treating Physician Rule

Plaintiff argues the ALJ erred in failing to give substantial deference to Plaintiff's treating physician Dr. Kumar, who opined Plaintiff was incapable of performing even low stress jobs because of his pain and assessed significant functional limitations. (Doc. 11, at 16–17). Plaintiff argues Dr. Kumar's medical opinion offers evidence of the nature and severity of Plaintiff's impairments over time and that the ALJ erred in discrediting Dr. Kumar's opinion because these "seemed to rely exclusively on the subjective complaints of the claimant." (Doc. 11, at 17). Specifically, Plaintiff argues Dr. Kumar's opinion on the severity of Plaintiff's condition was based on treating Plaintiff's impairments over time and argues "no treating or examining source of record offered an opinion contrary to that of Dr. Kumar, but for the state examiner who inexplicably found no sensory defect." (Doc. 11, at 17–18). Plaintiff's arguments fail because the ALJ considered contradictory opinions offered by consulting physicians Drs. Cho, Henderson, and Neiger. Moreover, objective evidence does not support Dr. Kumar's opinion and there is no evidence his opinion was based on anything more than Plaintiff's subjective complaints of pain.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242. A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2)

13

is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2).[1] In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion – reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409B10 (6th Cir. 2009). Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows her physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits

---

1. 20 C.F.R. § 404.1527(d) – the regulation section defining the treating physician rule – was recently renumbered to § 404.1527(c) due to revisions not affecting the provision or rule. 77 FR 10650, at * 10656 (Feb. 23, 2012). Many cases cite § 404.1527(d) to explain the rule but the Court will cite the current and correct citation.

meaningful review of the ALJ's application of the rule." *Id.*

The ALJ gave minimal weight to Dr. Kumar's opinion because it was inconsistent with medical evidence and lacked objective support. (Tr. 29). Specifically, the ALJ concluded "the opinions of Dr. Kumar seem to rely exclusively on the subjective complaints of the claimant as there is a lack of objective medical evidence which would substantiate a finding of total disability or complete lack of functional ability." (Tr. 29). This conclusion is backed by the record. Dr. Kumar's various opinions state conclusively that Plaintiff cannot work but provide no medical reasoning except for the subjective pain Plaintiff was reporting. (Tr. 229–30; 323–24; 407–12). Consultative physician Dr. Neiger noted Dr. Kumar's opinion did not rely upon objective findings. (Tr. 441). Moreover, the ALJ correctly noted the medical evidence simply does not support Dr. Kumar's extremely limited assessment of Plaintiff's functional abilities. At one consultative exam, Plaintiff had 5/5 strength throughout; he could use his hands normally; and he could walk normally without the use of an ambulatory aid. (Tr. 440). At another consultative exam, Plaintiff demonstrated a satisfactory range of motion in his upper and lower extremities; satisfactory grip strength; and no abnormalities were noted on his sensory exam. (Tr. 427). In March 2008, Plaintiff demonstrated no instability in his upper extremities, had normal motor strength and muscle tone, had full active non-irritable range of motion in both shoulders, his neurovascular status was intact, and radiographs of both shoulders were unremarkable. (Tr. 264–65). In June 2008, neurologist Dr. Berke stated Plaintiff's condition had improved over the past seven months. (Tr. 335). In December 2008, Plaintiff was found to have "[s]tocking and glove decreased perception of light touch, pinprick, and vibration, and proprioception", but neurological examination was otherwise normal and plaintiff appeared well. (Tr. 472–74). And test results showed "no evidence of significant postganglionic

sympathetic sudomotor abnormality like that seen in autonomic/small fiber neuropathy." (Tr. 480). Plaintiff admitted to Dr. London that his symptoms decrease when he took Naprosyn, but stated he did not take the drug on a regular basis. (Tr. 260).

Given all these facts, the ALJ gave good reasons for his determination to give Dr. Kumar's opinion minimal weight. It is indeed inconsistent with substantial record evidence. Thus, the ALJ did not err assessing physician opinion evidence.

Credibility Analysis

Plaintiff also argues the ALJ erred in analyzing Plaintiff's pain and credibility by pointing out he has been diagnosed with small fiber neuropathy and his medical tests objectively verify this diagnosis, and by arguing the ALJ failed to consider Plaintiff's pain disorder and the emotional factors contributing to Plaintiff's pain. (Doc. 11, at 14–15). Further, Plaintiff disputes Dr. Neiger's claim that Plaintiff was not credible because Dr. Neiger did not consider the November 2008 tissue test that established small fiber neuropathy. (Doc. 11, at 14).

A claimant's subjective complaints can support a claim for disability, but there must also be objective medical evidence in the record of an underlying medical condition. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). On review, the Court is to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Id.* (citation omitted). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

16


specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, *2. In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff] are reasonable and supported by substantial evidence in the record." *Jones,* 336 F.3d at 476.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms (especially pain) are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

> (I) [A Plaintiff's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [a Plaintiff's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate [his] pain or other symptoms;
>
> (v) Treatment, other than medication, [a Plaintiff] receive[s] or ha[s] received for relief of [his] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use or ha[s] used to relieve . . . pain or other symptoms; and
>
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).

In considering Plaintiff's testimony the ALJ determined "Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms", but his statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC determination. (Tr. 27). In determining this, the ALJ considered Plaintiff's daily activities, which he found consistent with an RFC for performing simple repetitive tasks. The ALJ pointed to evidence indicating Plaintiff can perform simple household chores such as light cleaning, washing dishes, preparing simple meals, and even mowing the lawn and working in the garden. (Tr. 26–27). The ALJ further noted Plaintiff attends church weekly and goes shopping. (Tr. 27).

Further, the ALJ considered the three consultative medical opinions, each of which stated Plaintiff could perform a wide range of tasks far exceeding that which Plaintiff or Dr. Kumar (relying on Plaintiff's own report) testified he was capable of performing. (Tr. 27–31). And the record shows Plaintiff's depression was generally well-controlled and he had good strength and range of motion. (Tr. 427, 436, 473–74, 503). As for Plaintiff's argument that the record conclusively established a diagnosis of small fiber neuropathy, the mere diagnosis of a condition is insufficient to show the limitations from that condition. *See Mikesell v. Astrue*, 2012 WL 1288733, *adopted by* 2012 WL 1288724 (N.D. Ohio 2012) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)). And here, the record shows Plaintiff did not even take the medication that improved his symptoms, further undermining his credibility. (Tr. 260). The ALJ discussed Plaintiff's allegations of pain and summarized the medical record extensively, and he assigned numerous limitations related to pain in the RFC. (*See* Tr. 27–31). Ultimately, given the inconsistency of

18

Plaintiff's testimony with the record and his daily activities, the ALJ's decision to discredit Plaintiff regarding his capabilities was reasonable. Thus, the ALJ's decision is supported by substantial evidence and he did not err.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, the Court should find substantial evidence supports the Commissioner's decision denying DIB benefits. The undersigned therefore recommends affirming the Commissioner's decision.

<div style="text-align: right;">s/James R. Knepp, II<br>United States Magistrate Judge</div>

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).